# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-07-00080-CR
## NO. 03-07-00082-CR

**Sidney Paul Sledge, Appellant**

**v.**

**The State of Texas, Appellee**

**&**

## NO. 03-07-00081-CR

**Sidney Paul Sledge Jr., Appellant**

**v.**

**The State of Texas, Appellee**

---

**FROM THE DISTRICT COURT OF TRAVIS COUNTY, 167TH JUDICIAL DISTRICT
NOS. D-1-DC-05-500011, D-1-DC-04-500557 & D-1-DC-05-500040
HONORABLE MICHAEL LYNCH, JUDGE PRESIDING**

---

## O P I N I O N

Sidney Paul Sledge appeals two judgments of conviction for indecency with a child by contact, in each of which the trial court assessed concurrent twenty-year prison terms, and four judgments of conviction for aggravated sexual assault of a child, in each of which the court assessed concurrent forty-year prison terms. *See* Tex. Penal Code Ann. § 21.11 (West 2003),

§ 22.021 (West Supp. 2007). In one of his three points of error, appellant contends that the trial court erred by rendering more than one judgment on a single count. We will sustain this contention and set aside one of the aggravated sexual assault convictions. We will overrule appellant's other points of error, by which he challenges the factual sufficiency of the evidence and complains of the admission of outcry testimony, and affirm the remaining convictions.

## INDICTMENTS AND JUDGMENTS

Appellant was jointly tried on three indictments, each of which contained multiple counts and paragraphs accusing him of aggravated sexual assault of a child, indecency with a child by contact, and indecency with a child by exposure. At trial, the State abandoned all of the indecency by exposure allegations and one of the indecency by contact allegations. The remaining counts and paragraphs were submitted to the jury as they were alleged in the indictments.

The complainant in cause number D-1-DC-04-500557 was appellant's nine-year-old daughter, J.S.[1] The counts and paragraphs submitted to the jury, and the jury's verdicts, were as follows:

Count one, paragraph one: penetration of the complainant's anus by appellant's sexual organ. *See* Tex. Penal Code Ann. § 22.021(a)(1)(B)(i) (West Supp. 2007). Verdict: not guilty.

Count one, paragraph two: penetration of the complainant's sexual organ by appellant's sexual organ. *See id*. Verdict: guilty.

---

[1] We state the complainants' ages as of the offense date alleged in the indictments. The complainants were two years older at the time of appellant's trial.

2

Count one, paragraph three: causing the complainant's anus to contact appellant's sexual organ. *See id*. § 22.021(a)(1)(B)(iv). Verdict: guilty.

Count two: touching the complainant's breast with the intent to arouse and gratify appellant's sexual desire. *See id*. § 21.11(a)(1), (c)(1) (West 2003). Verdict: guilty.

The complainant in cause number D-1-DC-05-500011 was appellant's five-year-old daughter, X.S. The counts and paragraphs submitted to the jury, and the jury's verdicts, were as follows:

Count one, paragraph one: penetration of the complainant's sexual organ by appellant's sexual organ. Verdict: not guilty.

Count one, paragraph two: causing the complainant's sexual organ to contact appellant's sexual organ. *See id*. § 22.021(a)(1)(B)(iii) (West Supp. 2007). Verdict: guilty.

Count two: touching the complainant's genitals with the intent to arouse and gratify appellant's sexual desire. Verdict: guilty.

The complainant in cause number D-1-DC-05-500040 was appellant's seven-year-old son, E.S. The counts and paragraphs submitted to the jury, and the jury's verdicts, were as follows:

Count one: penetration of the complainant's anus by appellant's sexual organ. Verdict: guilty.

Count two, paragraph one: touching the complainant's anus with the intent to arouse and gratify appellant's sexual desire. Verdict: not guilty.

Count two, paragraph two: touching the complainant's genitals with the intent to arouse and gratify appellant's sexual desire. Verdict: not guilty.

3

The district court rendered a judgment of conviction on each count and paragraph for which there was a verdict of guilt. In point of error two, appellant contends that the court erred in cause number D-1-DC-04-500557 by rendering judgments of conviction on both paragraph two and paragraph three of count one. We agree.

If the State wishes to allege several different offenses in a single indictment, it must allege each offense in a separate count. Tex. Code Crim. Proc. Ann. art. 21.24(a) (West 1989). Within each count, the State may allege in separate paragraphs different methods of committing the same offense. *Id*. art. 21.24(b). Because a count alleges a single offense, an indictment cannot authorize more convictions than there are counts, and there can be only one conviction per count. *Martinez v. State*, 225 S.W.3d 550, 554 (Tex. Crim. App. 2007). In *Martinez*, the court of criminal appeals held that the trial court erred by rendering judgments of conviction on two paragraphs within a single count of the indictment.[2] *Id*. at 555. This Court recently followed *Martinez* and held that a trial court erred by rendering judgments of conviction on two paragraphs in one count and on three paragraphs in a second count.[3] *Fowler v. State*, 240 S.W.3d 277, 281 (Tex. App.—Austin 2007, pet. ref'd).

The State seeks to distinguish *Martinez*, noting that the defendant in that case objected to the jury charge on the ground that it submitted more than one paragraph per count. *See*

---

[2] The two paragraphs alleged separate indecency with a child offenses—touching the complainant's breast and touching the complainant's genitals—for which the defendant could have been convicted had they been alleged in separate counts. *See Pizzo v. State*, 235 S.W.3d 711, 719 (Tex. Crim. App. 2007).

[3] Once again, the paragraphs alleged distinct offenses for which the defendant could have been separately convicted had they been alleged as counts.

4

*Martinez*, 225 S.W.3d at 552-53. The State urges that because appellant did not similarly object in this case, the trial court was authorized to impliedly "amend" the indictment by treating the paragraphs as if they were separate counts.[4] The State cites article 28.10, which permits the amendment of an indictment after trial begins if the defendant does not object. Tex. Code Crim. Proc. Ann. art. 28.10(b) (West 2006). Article 28.10 does not apply here, however, because the indictment was not *actually* amended. The State cites no authority, and we are aware of none, holding that article 28.10 permits a trial court to *impliedly* amend an indictment, whether by rendering more than one judgment of conviction on a single count or otherwise.

*Martinez* does not support the State's argument. First, the error identified in *Martinez* was not the trial court's submission to the jury of more than one paragraph per count. *See Martinez*, 225 S.W.3d at 555. Rather, after the jury returned its verdicts, the court erred by rendering judgment on more than one paragraph per count. *See id*. Thus, in the causes now before us, appellant's failure to object to the jury charge is irrelevant because the error did not occur until after the charge was given, the verdicts were returned, and the judgments of conviction were rendered.[5] Second, *Martinez* expressly states that a trial court may not impliedly amend an indictment by treating paragraphs as if they were counts. *See id*. at 554. For a trial court to render judgment on multiple paragraphs within

---

[4] The State concedes that there was no objection to the charge in *Fowler*. *See Fowler v. State*, 240 S.W.3d 277, 279-80 (Tex. App.—Austin 2007, pet. ref'd). The State notes, however, that it did not advance its "implied amendment" argument in that case.

[5] The State does not contend that appellant's failure to object below waived the error he asserts. Because *Martinez* holds that a trial court is not legally authorized to render more than one judgment of conviction per count, the State reasons that if the indictment was not impliedly amended (and we hold that it was not), the second and any subsequent judgment on a single count is void. *See Nix v. State*, 65 S.W.3d 664, 667-68 (Tex. Crim. App. 2001).

a single count as if they were separate counts alleging different offenses violates both the defendant's due process right to notice of the charges against him and his constitutional right to grand jury screening of those charges. *See id.*

The State also cites this Court's opinion in *Patterson v. State*, in which we held that the trial court did not err by authorizing the defendant's conviction under both paragraphs of a single count. 96 S.W.3d 427, 433-34 (Tex. App.—Austin 2002), *aff'd*, 152 S.W.3d 88, 92 (Tex. Crim. App. 2004). Insofar as *Patterson* holds that a trial court may submit more than one paragraph of a count to the jury, it is consistent with *Martinez*. But insofar as *Patterson* holds that a trial court may treat paragraphs as if they were counts and may render judgment of conviction on more than one paragraph of a single count, it is contrary to *Martinez* and should be considered overruled.

By alleging the three sexual assaults as paragraphs under a single count rather than as three separate counts, the State in cause number D-1-DC-04-500557 gave appellant notice that he risked only one conviction for aggravated sexual assault and effectively limited itself to only one aggravated sexual assault conviction.[6] After the jury returned verdicts convicting appellant on paragraphs two and three, the trial court erred by rendering judgment on both paragraphs because the law permits only one conviction per count in the indictment. *See id.* at 555. The error was not harmless because appellant was convicted of more offenses than were authorized by law. *See id.* The remedy is to set aside one of the two judgments of conviction under count one. *See id.* Accordingly, we will reverse the judgment of conviction on count one, paragraph three.

---

[6] The same can be said for count one in cause number D-1-DC-05-500011 and count two in cause number D-1-DC-05-500040. In those causes, however, the jury's verdicts mooted the issue.

**EVIDENCE**

In his first point of error, appellant contends that the evidence is factually insufficient to sustain the guilty verdicts. When there is a challenge to the sufficiency of the evidence to sustain a criminal conviction, the question presented is whether a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 324 (1979) (legal sufficiency); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007) (legal sufficiency); *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000) (factual sufficiency). In a factual sufficiency review, all the evidence is considered equally, including the testimony of defense witnesses and the existence of alternative hypotheses. *Clewis v. State*, 922 S.W.2d 126, 129 (Tex. Crim. App. 1996); *Orona v. State*, 836 S.W.2d 319, 321 (Tex. App.—Austin 1992, no pet.). The evidence will be deemed factually insufficient if the evidence supporting the verdict is so weak as to make the finding of guilt clearly wrong or manifestly unjust, or if the verdict is against the great weight and preponderance of the available evidence. *Watson v. State*, 204 S.W.3d 404, 414-15 (Tex. Crim. App. 2006); *Johnson*, 23 S.W.3d at 11.

*Background*

Appellant, who is also known as "Kirby," and his wife, Cristy Sledge, have five living children: the three complainants, J.S., E.S., and X.S., and their two younger siblings, S.S. and R.S. A sixth child, referred to as "baby Kirby," was stillborn. During 2003, the family was living in a trailer on property owned by appellant's mother, Mary Sledge. Mary and appellant's father lived in a second trailer on the property, while a third trailer was the residence of appellant's sister and her

7

family. During 2004, appellant, Cristy, and the children moved to a white house about two blocks from the Sledge property.

Child Protective Services workers began an investigation into the welfare of appellant's children in 2002. In early 2003, a CPS investigator prepared a report finding no evidence of physical abuse or neglect and reporting no evidence of sexual abuse. CPS workers returned to the Sledge property in September 2003. When they arrived, Cristy and the children fled into the nearby woods. Although the children were soon returned to the residence, appellant loaded them into a van and drove away before they could be interviewed. One of the investigators testified that the trailer in which appellant and his family were then living had no running water and non-functional toilets. The trailer had holes in the floor and was infested with roaches, and there were puddles of urine throughout the premises. CPS obtained temporary managing conservatorship of appellant's children in September 2004 and took physical custody of them in October 2004. The children were initially placed in a shelter. In November 2004, all five children were placed in a foster home.

The foster parents were Tracy and David Conti. The Contis testified that the three complainants were developmentally behind their age groups. For example, Tracy said that J.S., who was then nine, "did not know how to shower, did not know how to take a bath, did not know how to use soap, shampoo, she did not know how to wipe when she would go to the bathroom." More than once, J.S. smeared feces around the bathroom and on her body. Similarly, David testified that he had to teach E.S., who was seven, "how to wash up and bathe himself." E.S. also urinated on the bedroom floor. When eating, the children would "shove food into their mouth[s] so full that it would fall out." They also hoarded food, hiding it under their beds.

8

Tracy testified that the children engaged in inappropriate touching. She said, "There would be times, slap butts or hug[s], and they would get face-to-face, mouth-to-mouth, so we would have to correct some of those issues." Tracy said that J.S. would "act out" sexually: "She had a real—she would lick her lips or her teeth and she would get her—she would just have a look on her face, if it were—." J.S. behaved in this manner only in front of men. Tracy also described J.S.'s unusual doll play: "We had Barbie dolls, Barbie dolls were having sex. The man was—his head was between the Barbie doll's legs." Tracy testified that this happened more than once.

***Outcries***

J.S. was the first child to make an outcry regarding sexual abuse. David Conti testified that he and Tracy took J.S. to a doctor's appointment on November 29, 2004. During the trip, J.S. told them that "her dad had put his private area," which she called a "dido," in her "monkey," which was her term for her vagina. She reported that this had happened on more than one occasion and that it hurt. According to David, J.S. also said that "he would put it in her butt and that it would make her cry. She would tell him it would hurt but he would keep doing it until he was done." J.S. said that "she knew that . . . her dad was done [when] he wasn't making any more ah ah noises." She added, "He would make a loud noise and then there would be a hard push and then he would stop and then he would pull it out and tell her to put her clothes on." J.S. also told the Contis that she had heard her father having sex with X.S. David testified that J.S. said "she knew [X.S.] had had sex because she heard them." J.S. told David that she heard them "making the ah ah noises."

9

J.S. made a second outcry on December 2, 2004. On this occasion, she was in the car with Tracy Conti and X.S. Tracy testified, "She was telling us that her dad had touched her on her boobs and that he also had put his . . . dido . . . in her monkey and that it was uncomfortable, and then she said but it wasn't as uncomfortable as when her dad put it in her butt and that she wasn't to tell anybody that." Tracy said that J.S. said that this had been going on "since they lived in the camper and another house, several different homes."

That same night, the Contis found X.S. crying during their evening bed check. They brought her to the living room and, after some hesitation, she told them that "her dad had touched her in her private area." Tracy testified, "She was crying, talking about her dad touching her in her private area, that she would have her go under the covers and he would get behind her, pull her pants down, pull his pants down and put it in her butt . . . ." Tracy went on, "She also said that he would pull his pants down, pull her pants down, and he said he did this to all four year olds at least once. She said daddy put his pee pee in her pee pee and she cried." According to Tracy, X.S. said that when this happened, her dad made "the oh and the ah, ah and those noises." X.S. also described seeing "a green substance she said that came out, sometimes it was a yellowish white she said or a green substance."

E.S. made his first outcry to the Contis on January 2, 2005. David testified that he and E.S. were sitting at the dining table and E.S. "was very upset." David added, "I remember tears were rolling down his face as he was talking about things that had happened to him, and then [E.S.] said that his dad had had sex with him, he said his dad would put his penis in his butt. He said that when he was done, he would have drops of yellow white stuff on him and he said his dad would have

10

him lay on his stomach." E.S. told David that he got the "yellow white stuff in his mouth and legs and chest. He said it tasted like honey oil. It was nasty and dad told him to swallow it." E.S. also told David that his parents took pictures of him, J.S., and E.S. performing sex acts.

### *Interviews and Examinations*

The Contis reported each outcry to CPS. CPS, in turn, notified the police and arranged for the children to be interviewed at the Center for Child Protection. Forensic interviewer Betzabel Burciaga testified that she interviewed J.S. on December 2, 2004, and X.S. on December 6, 2004. Burciaga testified that both girls reported being sexually assaulted by their father. Burciaga interviewed the girls a second time in January 2005, after each made outcries regarding sexual abuse by their grandfather.[7] These interviews were recorded on videotape, and edited versions were introduced in evidence and played for the jury.

Forensic interviewer Cyndi Cantu first interviewed E.S. on December 8, 2004, before he made his initial outcry.[8] She interviewed him a second time on January 5, 2005, following his outcry to the Contis. Cantu did not describe E.S.'s statements during this second interview but, like the other interviews, it was recorded and the recording was shown to the jury.

Each complainant was examined by Dr. Beth Nauert, a pediatrician with expertise in child sexual abuse cases. Nauert testified that J.S. told her during the examination that "her father would put his diddle, which is what she called a penis, into her vagina and her rectum." J.S. was

---

[7] Burciaga testified that she conducted a third interview of J.S. This interview concerned statements that J.S. made regarding the death of "baby Kirby," a subject we will address later in this opinion.

[8] This interview also related to "baby Kirby."

unclear on the time frame, but told the doctor that this happened on multiple occasions. Nauert testified that X.S. told her that "her father touched her vaginal area on top of her clothes." E.S. told Nauert that his father "put his thing in [his] bottom. Orange stuff came on my body." E.S. also told the doctor about other incidents of sexual abuse by his mother and several cousins. Nauert testified that her physical examinations of the children were normal and, although they were not inconsistent with the reported abuse, they did not confirm it.

***Complainants' Testimony***

J.S. testified that her parents were Kirby and Cristy Sledge. She testified that her dad, or Kirby, touched her "boobies" with his hands and put his "dick" inside her "hooch" and her "butt." She testified that this happened more than once, at both the trailer and the white house. J.S. testified that her mother saw appellant touching her and took photographs. She also said that her grandfather had touched her "hooch" with his hands. J.S. often contradicted herself. For example, she said that she had always told the truth about her parents, but she later said that she lied when she told Burciaga that her mother had touched her genitals. She also made contradictory statements regarding whether or not she had seen appellant having sex with X.S. J.S. had not seen appellant for two years and could not identify him in court. She identified State's exhibit six, a photograph of appellant taken two years earlier, as her father, Kirby Sledge. J.S. also testified about the death of "baby Kirby." She said that he "came out of my mama's stomach wrong." She also testified, however, that she saw "baby Kirby" fall from the top of a bunk bed and hit the floor. She said that when this happened, "there was blood coming down."

12

X.S. testified that her father, who she also called Kirby, touched the inside of her "coochie" with his fingers and put his "ding dong" inside her "butt." She also contradicted herself, saying later that appellant did not touch her "coochie" and always kept his "ding dong" covered. X.S. was also unable to identify appellant at trial. She identified State's exhibit six as a photograph of her father, Kirby Sledge, and agreed that it showed "how Kirby looked the last time [she] saw him." During cross-examination, X.S. acknowledged that she did not always tell the truth to the persons she talked to, but she said that she could not remember who she lied to. She also remembered "baby Kirby" falling from the bed and cracking his head, although she said that she did not see this happen.

E.S. testified that his father, Kirby Sledge, touched his "front part" and his "back part" with his hand. E.S. also testified that appellant's "front part" touched his "back part." He said this happened more than once. E.S. remembered telling the Contis that "Kirby put his front part inside [E.S.'s] back part" and said that this statement was true. E.S. said during cross-examination that he put his "thing" in his father's "back side." Like his sisters, E.S. was unable to identify appellant at trial, but identified State's exhibit six as a photograph of his father, Kirby Sledge.

E.S. testified that someone he did not identify took pictures of him and his sisters while they were naked. He also said that Cristy and his "grandpa" touched him. E.S. initially testified that he never saw anything happen to J.S. or X.S., but he said during cross-examination that he had seen Kirby doing "bad stuff" with X.S. Also during his cross-examination, E.S. recalled telling the Contis that Kirby and Cristy had sex with his grandfather and grandmother. He said that he thought this happened because J.S. told him that it did.

13

### *Other Testimony*

Detective Gerald Kim testified that he investigated the complainants' statements that they had been photographed while engaged in sexual activities. He said that he found no evidence to confirm these statements. He added that all commercial photo developers contact the police when they encounter child pornography.

Both the State and the defense called an expert witness. The State's expert was psychologist William Lee Carter. Carter testified that in assessing the credibility of a child's outcry, he considers whether the child's later statements are consistent with the initial outcry. He also considers "whose idea is it to tell." That is, did the child volunteer the information or was the child prompted by an adult. Carter also looks for "sensory detail"—descriptions of the details of sexual acts that would not normally be within the child's experience. Carter said that "[t]he world that these abused kids come from is so chaotic that the stories that they tell are also sometimes chaotic and you can't make sense of them."

Carter also explained that children who are sexually abused by a parent or some other authority figure will commonly not make an outcry until they are placed into a new living situation and have had time to develop a sense of trust in their new care givers. Carter testified that children who are sexually abused are often neglected in other ways, and as a result they will display bad manners, a lack of hygiene, and other behavioral problems.

The defense expert was psychologist Matthew Ferrara. Ferrara testified that the younger the child, the more prone the child is to making a false outcry. He added that a child who is developmentally disabled will be less mature than his or her biological age and thus more likely

to make a false accusation. Ferrara also described the danger of implanting false memories in young children through repeated interviews and the use of leading questions. Ferrara criticized the use of anatomically correct dolls, as had been used by the forensic interviewers in these cases, saying that recent studies show that such dolls "actually suggest to a child what should be done or could be done" and hence increase the likelihood of a false statement.

Two other defense witnesses—a family friend and appellant's sister—testified that J.S. had a vivid imagination, would fantasize, and was dishonest. Appellant's half brother testified that he had never seen any pornographic photographs of appellant's children.

*Discussion*

By challenging only the factual sufficiency of the evidence, appellant effectively concedes that the evidence in these causes is legally sufficient to sustain his convictions. *See Clewis*, 922 S.W.2d at 134. Nevertheless, appellant urges that when all the testimony is considered equally, the evidence of guilt is so weak and so contrary to the great weight of the contrary evidence as to make his convictions manifestly improper. The essence of appellant's argument is that the complainants' outcry statements and trial testimony were not credible.

Appellant argues that the complainants had two motives to falsely accuse him and his wife of sexual misconduct. First, appellant suggests that the complainants were emotionally distraught and angry with their parents over the death of their younger brother, "baby Kirby." Appellant notes that although it was undisputed that the child was stillborn at the hospital, both J.S. and X.S. claimed to have seen the child at their home and remembered him falling from his bed.

15

Appellant urges that the children's accounts of their sexual abuse at the hands of appellant and other family members was similarly fanciful.

Appellant suggests that the complainants were further motivated to make false accusations because they did not want to return to their natural family. He bases this argument on the evidence describing the filthy conditions in which the children were living, their lack of nourishment, and their developmental problems. He also points to the Contis' testimony describing the many gifts the children received while in their care. He notes that X.S. testified that she told the Contis about the "bad touches" "[s]o [she] could have a good life."

As further evidence of the complainants' lack of credibility, appellant cites their trial testimony: the difficulty they had in recalling events, the inconsistent statements, and the admissions that they had made false statements in the past. Appellant also notes that in the journal she kept while the complainants were living with her, Tracy Conti wrote that J.S. "lies so much it is very hard to believe her with anything" and that J.S. "could lie with a serious face and at the same time swear she didn't lie." Conti testified, however, that those remarks referred to incidents of misbehavior in the home and not to J.S.'s sexual abuse outcries. Appellant also claims that E.S. was malleable and suggestible, and simply repeated what J.S. told him. He argues that E.S.'s accounts became more grandiose and fantastic as his testimony proceeded. Appellant points out that there was no physical evidence of sexual abuse, and he also draws attention to the fact that the complainants were unable to identify him at trial.

Appellant argues that there was a strong likelihood that the complainants had developed false memories concerning the alleged abuse. Each of the complainants was interviewed

16

more than once at the Center for Child Protection, and the children were also shown to have collectively discussed their outcries with each other and with the Contis. Tracy Conti testified, however, that the group discussions in their home took place only after the children were individually interviewed on videotape at the center. The forensic interviewers testified that the children were never interviewed twice about the same subject; each interview related to a different matter. Appellant's argument also does not account for the complainants' outcry statements to their foster parents, which were as vivid and detailed as their trial testimony was vague and inarticulate. Although appellant attempted to show that the complainants had seen sexually explicit movies on cable television, the trier of fact could reasonably conclude that the details contained in the outcry statements were strong evidence that the complainants were describing events that they had actually experienced.

When conducting a factual sufficiency review, we must give due deference to the jury's determinations, particularly those concerning the weight and credibility of the testimony and other evidence. *Johnson*, 23 S.W.3d at 9; *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997). The jurors in these causes were able to watch the complainants as they testified and were in the best position to decide whether they were frightened children doing their best to accurately describe horrible events two or more years in the past, or confused children who had been misled (inadvertently or otherwise) into making false accusations, or simply liars. The four not guilty verdicts demonstrate that the jurors were prepared to find appellant not guilty if they believed that an accusation was not proved. Considering all the evidence equally, we hold that the evidence supporting the guilty verdicts is not so weak or so against the great weight and preponderance of the

17

other evidence as to make the findings of guilt clearly wrong or manifestly unjust. Point of error one is overruled.

## OUTCRY STATEMENTS

In his last point of error, appellant urges that the trial court erred by admitting the complainants' outcry statements to the Contis because the defense was not given the notice required by statute. *See* Tex. Code Crim. Proc. Ann. art. 38.072 (West 2005). Broadly speaking, article 38.072 exempts from the hearsay rule sexual abuse outcry statements made by children twelve years of age or younger. One requisite for the admission of an outcry statement is that the offering party notify the adverse party at least two weeks before trial begins *Id*. art. 38.072, § 2(b)(1). Appellant argues that the State did not satisfy this notice requirement because no article 38.072 notice appears in the clerk's records.

The only relevant objection voiced by appellant during the trial came during Tracy Conti's testimony. When the prosecutor asked her to relate the outcry statement J.S. made to the Contis during the trip to the doctor, which the record elsewhere shows was on November 29, 2004, defense counsel approached the bench and said:

> MR. FOX: From my memory and my notes, the outcry notice I got was from David Conti and the initial outcry, and hers was a—was a subsequent outcry. First outcry is to the father. Can they establish the date that this happened? I wasn't given notice of this.
>
> MS. MCFARLAND: I can do it through David. They were both there.
>
> MR. FOX: I don't know what she is going to say since I haven't been given notice of it.

MS. MCFARLAND: That's fine.

MR. FOX: We can remove the jury.

MS. MCFARLAND: No, that is fine.

Resuming her questioning, the prosecutor asked Tracy to describe the outcry statement J.S. made on December 2, 2004, which she did without further objection by the defense. The November 29, outcry statement was later introduced through David Conti's testimony.

This recitation from the record demonstrates that defense counsel was aware of the November 29, statement, but had been notified that it would be offered through David Conti rather than Tracy Conti. Appellant cites no authority holding that the notice required by article 38.072 must be filed and made a part of the clerk's record, although that might be the better practice. The record also demonstrates that rather than forcing the issue, the prosecutor wisely chose to wait and, consistent with the notice given to the defense, introduce the November 29, statement through David Conti.

The defense did not object to any other outcry testimony based on a lack of proper notice. The comments of counsel quoted above show that notice of the outcry statements was given. No error is presented. Point of error three is overruled.

**CONCLUSION**

In cause numbers D-1-DC-05-500011 and D-1-DC-05-500040, the judgments of conviction are affirmed. In cause number D-1-DC-04-500557, the judgments of conviction on count

one, paragraph two and count two are affirmed, but the judgment of conviction on count one, paragraph three is reversed and the prosecution of that paragraph is dismissed.

_____

W. Kenneth Law, Chief Justice

Before Chief Justice Law, Justices Waldrop and Henson

Affirmed in part; Reversed and Dismissed in part

Filed:   August 19, 2008

Publish